IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HECTOR HUERTAS, )
    Plaintiff ) C.A. No. 10-10 Erie
   )
v ) **District Judge McLaughlin**
   ) **Magistrate Judge Baxter**
JEFFREY BEARD, et al., )
    Defendants )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that:
1. Defendants' motion for summary judgment [ECF No. 78] be granted; and
2. Plaintiff's motion for partial summary judgment [ECF No. 82] be denied.

### II.    REPORT

#### A.    Relevant Procedural History

On January 12, 2010, Plaintiff Hector Huertas, an inmate incarcerated at the State Correctional Institution at Forest in Marienville, Pennsylvania ("SCI-Forest"), initiated this civil rights action by filing a *pro se* complaint pursuant to 42 U.S.C. § 1983. He subsequently filed an amended complaint on January 25, 2010 [ECF No. 3], and a second amended complaint on April 5, 2010 [ECF No. 19]. The second amended complaint merely combines the allegations of the original and amended complaints and is, thus, the operative complaint in this case.

Named as Defendants are: Jeffery Beard, former Secretary of the Pennsylvania

Department of Corrections ("Beard"); Richard M. Hall, Deputy Superintendent at SCI-Albion ("Hall"); Nancy A. Giroux, Deputy Superintendent at SCI-Albion ("Giroux"); Michael R. Clark, Corrections Classification Program Manager and Program Review Committee ("PRC") member at SCI-Albion ("Clark"); Captain T. Balos, Shift Commander at SCI-Albion ("Balos"); Major M. Overmyer, corrections officer and PRC member at SCI-Forest ("Overmyer"); E.D. Ray, Facility Program Manager and PRC member at SCI-Forest ("Ray"); Captain Repko, Shift Commander on the 2nd shift at SCI-Forest ("Repko"); Raymond J. Sobina, former Superintendent at SCI-Albion ("Sobina"); and Michael C. Barone, former Superintendent at SCI-Forest ("Barone").

Plaintiff generally alleges that Defendants violated his rights under the eighth and fourteenth amendments to the United States Constitution by continuing his confinement in the Restricted Housing Unit ("RHU") on administrative custody ("AC") status. More particularly, Plaintiff sets forth the following seven causes of action: (1) a due process claim against Defendant Beard arising from Plaintiff's placement in the Long Term Segregation Unit ("LTSU") at SCI-Fayette from April 13, 2005 through May 30, 2006; (2) a due process claim against Defendant Beard for making the decision to "continue Plaintiff in the RHU on long term AC status indefinitely," after Plaintiff was released from the LTSU; (3)-(4) due process claims against Defendant Beard for continuing Plaintiff on AC status after reviewing Plaintiff's records on November 24, 2008, and May 29, 2009; (5) an Eighth Amendment deliberate indifference claim against Defendant Beard for subjecting Plaintiff to "constant illumination" in the RHU unit; (6) a due process claim against Defendants Hall, Clark, Balos, Repko, and Overmyer based on Plaintiff's continued confinement in the RHU on AC status; and (7) a due process claim

against Defendants Sobina and Barone based on Plaintiff's continued confinement in the RHU on AC status.

On April 8, 2010, Defendants filed an Answer denying the allegations of the second amended complaint [ECF No. 20], and the parties have since completed discovery. On November 9, 2010, Defendants filed a motion for summary judgment [ECF No. 78], arguing that many of Plaintiff's claims are barred by the statute of limitations, and the claims that are not time-barred are not adequately supported by competent evidence of record. Plaintiff has countered Defendants' motion by filing a partial motion for summary judgment [ECF No. 82] with regard to his due process claims against Defendants Overmyer, Ray, and Repko, pertaining to his placement in SCI-Forest's RHU on July 6, 2009, and the periodic reviews conducted by said Defendants as PRC members on September 3, October 1, and December 23, 2009. Plaintiff has not filed a separate brief in opposition to Defendants' motion, although he did file a "Concise Statement of Material Facts in Response to Defendants' Concise Statement of Facts Not in Dispute" [ECF No. 91], which reads more like a brief and will be so construed by the Court. Defendants have filed a response to Plaintiff's partial motion for summary judgment [ECF No. 87], and Plaintiff has filed a reply thereto [ECF No. 90]. This matter is now ripe for consideration.

### B. Relevant Factual History

Plaintiff is serving a life sentence for first degree murder and has been incarcerated in the custody of the Pennsylvania Department of Corrections ("DOC") since July 26, 1999. (See ECF

3

No. 79-6 at p. 2). During his period of confinement, Plaintiff has been found guilty of approximately 12 misconducts, several of which have been for verbal and/or physical assault. (See ECF No. 79-9 at p. 21). On October 28, 2002, Plaintiff and at least one other inmate attempted to escape from SCI-Graterford. (See ECF No. 79-6). As a result, Plaintiff received two misconducts for escape and possession of contraband, of which he was found guilty and sanctioned to 180 days of disciplinary custody. (See ECF Nos. 79-8, pp. 1-10). In addition, Plaintiff was criminally charged for the escape attempt and ultimately pled guilty on March 4, 2004, to one count of Criminal Attempt - Escape, in violation of 18 Pa.C.S.A. § 901(A). (See ECF No. 79-9). Since the escape attempt of October 8, 2002, Plaintiff has been confined continually in Level 5 housing units, including the RHU and LTSU, on either AC or disciplinary custody status.[1]

After Plaintiff's escape attempt at SCI-Graterford, he underwent a separation transfer to SCI-Greene. (ECF No. 79-9 at p. 22). While at SCI-Greene, the Security Office received information that Plaintiff was responsible for directing a gang hit on another inmate. In response to this information, Plaintiff was transferred to SCI-Frackville on February 17, 2004. (Id.). Within months of Plaintiff's arrival at SCI-Frackville, a Security Office investigation revealed that he was planning gang assaults on three inmates at the institution. The investigation resulted in his administrative custody transfer to SCI-Smithfield on or about June 15, 2004. (Id.).

---

[1] Pursuant to DC-ADM 802, an inmate may be placed on AC status in a Level 5 housing unit, such as the RHU, for a variety of reasons, including, but not limited to, being an escape risk or a danger to himself or others. (See ECF No. 79-3 at p. 8).

On July 22, 2004, the Security Office at SCI-Smithfield received credible information that Plaintiff and two other inmates were conspiring to plan an escape attempt. As a result, the Security Office recommended separations to be placed between these inmates, and staff recommended that Plaintiff be placed in the LTSU at SCI-Fayette due to his history of escape/possessing implements of escape, assault, and ongoing membership in a security threat group.(Id.). Plaintiff was subsequently transferred to SCI-Fayette's LTSU on April 12, 2005, where he remained until May 30, 2006, at which time he was released from the LTSU and transferred to SCI-Albion. (Id.; ECF No. 19, Second Amended Complaint, at ¶ 54). On July 6, 2009, Plaintiff was transferred to SCI-Forest, where he was continued on AC status in the RHU. (Id. at ¶ 156).

Sometime prior to his release from SCI-Fayette's LTSU, Plaintiff was placed on the Restricted Release List ("RRL").[2] (See ECF No. 79-9 at p. 23). An inmate on the RRL may not be released from a Level 5 housing unit without the written approval of the Secretary of Corrections or his designee, after an appropriate recommendation is made by the PRC and/or the Superintendent, or his designee. (See ECF No. 79-1 at p. 18). An inmate on the RRL receives periodic reviews from the PRC, at which the PRC determines whether the inmate will be continued on AC status or released to general population. (See ECF No. 79-1 at p. 13).

---

[2] The RRL "is a list of inmates who are restricted from release from AC status without the prior approval of the Secretary/designee. An inmate may be placed on this list when he/she poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern." (See ECF No. 79-1, at p. 19).

### C. Standards of Review

#### 1. Summary Judgment

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56©. The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the

pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247-249.

### 2  *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards

than formal pleadings drafted by lawyers" Haines v. Kerner, 404 U.S. 519, 520-521(1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

### D.    Discussion

#### 1.    Statute of Limitations

The federal civil rights laws do not contain a specific statute of limitations for § 1983 actions. However, it is well established that the federal courts must look to the relevant state statute of limitations for personal injury claims to determine the applicable limitations period. Sameric Corp. Del., Inc. v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998)(internal citations omitted). In this regard, federal courts sitting in Pennsylvania have adopted Pennsylvania's two

year personal injury statute of limitations set forth at 42 Pa.C.S.A. § 5524, in determining that a § 1983 claim must be filed no later than two years from the date the cause of action accrued. See Lake v. Arnold, 232 F.2d 360, 368 (3d Cir. 2000); Urrutia v. Harrisburg County Police Dept., 91 F.3d 451 (3d Cir. 1996). Furthermore, a claim under § 1983 accrues when the plaintiff "knew or should have known of the injury upon which [his] claim is based." Sameric, 142 F.3d at 599.

Here, Plaintiff's original complaint was filed as an attachment to a motion to proceed *in forma pauperis* on January 12, 2010; however, the complaint was apparently signed by Plaintiff on January 4, 2010. (See ECF No. 4 Complaint). Thus, for purposes of applying the statute of limitations, this Court will treat January 4, 2010, as the relevant filing date pursuant to the prison mailbox rule. See Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa.Super. 2001), citing Commonwealth v. Little, 716 A.2d 1287 (Pa.Super. 1998)(in determining the date upon which a prisoner's pleading is filed, Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]"). Accordingly, any claim concerning an injury of which Plaintiff "knew or should have known" prior to January 4, 2008, is barred by the statute of limitations.

Based on the foregoing, Plaintiff's due process claim against Defendant Beard arising from Plaintiff's placement in SCI-Fayette's LTSU from April 12, 2005, to May 30, 2006, is well beyond the reach of the two-year limitations period and should be dismissed as untimely. Defendants also argue that Plaintiff's remaining due process and Eighth Amendment claims regarding his continued confinement in the RHU since his release from the LTSU should be

allowed to proceed only insofar as they relate to Plaintiff's confinement in the RHU since January 4, 2008, and that the portion of such claims arising from events that occurred prior to January 4, 2008, should be dismissed as time-barred. The Court disagrees.

Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." Brenner v. Local 514, United Broth. of Carpenters and Joiners of America, 927 F.2d 1283, 1295 (3d Cir. 1991). Here, all of Plaintiff's due process claims challenge Defendants' decisions to continue his confinement in the RHU on AC status since on or about May 30, 2006. These are clearly claims of a continuing nature. In addition, Plaintiff's Eighth Amendment claim against Defendant Beard relates to the constant illumination in the RHU, which is also of a continuing nature. Thus, the Court finds that Plaintiff's due process and Eighth Amendment claims arising from his continued confinement in the RHU since his release from SCI-Fayette's LTSU are timely and should be addressed on their merits.

### 2. Merits

#### a. Fourteenth Amendment Due Process Claims

Plaintiff has stated various due process claims against the Defendants challenging his placement and continued confinement in the RHU on AC status.

To establish a due process claim under the Fourteenth Amendment, Plaintiff must demonstrate (i) the existence of a constitutionally protected liberty or property interest; and (ii) constitutionally deficient procedures by the state in its deprivation of that interest. Board of

10

Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972). If there is no protected interest, there is no need to determine whether the alleged deprivation was without due process. Alvin v. Suzuki, 227 F.3d 101, 116 (3d Cir. 2000).

In response to Plaintiff's due process challenge, Defendants argue that no due process rights were violated because no liberty interest was at stake. Specifically, Defendants assert that "long periods of confinement under highly restrictive conditions have been held insufficient to trigger the protections of the Due Process Clause," citing Griffin v. Vaughn, 112 F.3d 703, 706-09 (3d Cir. 1997)(transfer to administrative custody with strict limits on property, visitation and out-of-cell activities does not implicate inmate's due process rights). (ECF No. 80, Defendants' Brief, at p. 11). Additionally, the Supreme Court held in Sandin v. Conner, 515 U.S. 472 (1995), that "discipline in segregated confinement d[oes] not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486.

In reaching this conclusion, however, the Sandin court "did not pronounce a *per se* rule." Mitchell v. Horn, 318 F.3d 523, 531 (3d Cir. 2003). "In deciding whether a protected liberty interest exists under Sandin, we consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions." Mitchell, 318 F.3d at 531-32, citing Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000). In applying these factors, the Third Circuit has reached differing conclusions, "reflecting the fact-specific nature of the *Sandin* test." Mitchell, 318 F.3d at 532, comparing, *inter alia*, Shoats, 213 F.3d at 144 (eight years in administrative confinement, during which inmate was locked in his cell for all but two hours per week, denied contact with his family, and prohibited him from visiting the library or

11

"participating in any education, vocational, or other organization activities," clearly implicated a protected liberty interest), with Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002)(seven months of disciplinary confinement did not implicate a liberty interest), and Griffin, supra.

Here, Plaintiff has remained in administrative custody in the RHU for a continuous period of approximately five years after his release from SCI-Fayette's LTSU. During this time, the record suggests that Plaintiff has been exposed to conditions comparable to those experienced by the plaintiff in Shoats, which were found to have imposed significant hardship in relation to the ordinary incidents of prison life. (See ECF No. 19, Second Amended Complaint, at ¶¶ 204-209). Accordingly, Plaintiff has sufficiently demonstrated that he "has a protected liberty interest that has been adversely affected by his indefinite segregation in administrative custody." Shoats, 213 F.3d at 144.

Nonetheless, Defendants argue that "[t]o whatever extent the continuing and indefinite nature of Plaintiff's AC confinement does create an atypical condition and, thus, a limited liberty interest under Sandin, Plaintiff has been afforded all of the process that he is due." (ECF No. 80, Defendants' Brief, at p. 12). Specifically, Defendants assert that Plaintiff has received the requisite periodic reviews by the PRC, which is all the process that is required. (Id.). See Delker v. McCullough, 103 Fed. Appx. 694 (3d Cir. 2004)(holding that the DOC's periodic reviews of status provided inmate due process to which he was entitled for continuing placement in administrative confinement), citing Shoats, 213 F.3d at 147 (holding that periodic reviews by the PRC comport with minimum constitutional standards for due process). In support of this argument, Defendants have submitted copies of the reports from all periodic PRC reviews

12

Plaintiff has received since November 2002.[3] (ECF Nos. 79-2 to 79-4). However, Plaintiff does not dispute that he has received the requisite periodic reviews; rather, he claims that many of the reviews were "perfunctory" and "inadequate," and that he was not given adequate notice of the reasons he was confined in the RHU. (ECF No. 19, Second Amended Complaint at ¶¶ 55-59, 62-64, 69-90, 97-98, 108-118, 142, 145-146, 148-149, 156-159, 168-177, 200-201).

In the seminal case of <u>Hewitt v. Helms</u>, 459 U.S. 460 (1983), the Supreme Court recognized that administrative segregation must not be used as a pretext to indefinite confinement. <u>Id.</u> at 477 n. 9. To this end, periodic reviews of a prisoner's administrative confinement are required; however, due process does not require that these reviews allow for the submission of additional evidence or statements. <u>Id</u>. Instead,

> [t]he decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner - which will have been ascertained when determining to confine the inmate to administrative segregation - and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner.... [T]he ongoing task of operating the institution will require the prison officials to consider a wide range of administrative considerations....

<u>Id</u>.

In this regard, the Supreme Court emphasized that

> [i]n the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous

---

[3] Plaintiff has been in segregated housing (RHU and/or LTSU) since his escape attempt on October 28, 2002.

> incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior.

Hewitt, 459 U.S. at 474 (internal citations omitted); accord Shoats, 213 F.3d at 146 (finding that a prisoner "could conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct").

Here, Plaintiff has been confined in segregated housing since his escape attempt on October 28, 2002, and has been aware of his placement on RRL status since, at least, August 25, 2006. (See ECF No. 79-3 at p. 34). When he arrived at SCI-Albion on May 30, 2006, after his release from SCI-Fayette's LTSU, Plaintiff was given notice that he was being placed in the RHU "pending PRC review of inmate's records to determine placement into general population." (Id. at p. 33). On July 7, 2006, Plaintiff personally appeared before the PRC, at which time the PRC explained why he was in AC status, and Plaintiff was given the "opportunity to provide his version of his [AC] status." (Id. at p. 38). The PRC then informed Plaintiff that he would remain in AC status, but would be allowed a phone call, television, radio, and a non-contact visit. (Id.). At his PRC review on February 1, 2007, the PRC noted that Plaintiff "understands his escape attempt was very serious and that is why he is in this situation [in the RHU]." (Id. at p. 41).

On October 26, 2007, the PRC advised Plaintiff that if he remained misconduct-free for the next six months, they would "seriously consider writing a request to Central Office requesting his removal from the [RRL]." (Id. at p. 44). On February 21, 2008, the PRC reminded Plaintiff that he had "three (3) more months to show good behavior before they [would] consider submitting the request" to have him removed from the RRL. (Id. at p. 46). One month later, on

or about March 18, 2008, Plaintiff was found guilty of a misconduct for fighting and was sanctioned to 60 days of disciplinary custody. (ECF No. 79-5 at p. 2).

Upon completion of his disciplinary custody time, Plaintiff was notified that he was being returned to AC status "due to being on the do not release list [RRL] and the completion of a DC sanction." (ECF No. 79-4 at p. 2). At his subsequent PRC review on May 22, 2008, Plaintiff was advised that he would be continued on AC status "due to his most recent misconduct and that he needed to establish a period of positive conduct once again." (Id. at p. 6). On August 21, 2008, the PRC again continued Plaintiff on AC status, and Plaintiff filed an appeal to the Superintendent. (Id. at p. 7). In response to Plaintiff's appeal, the Superintendent expressed his finding that Plaintiff "is a dangerous individual and is fully aware of his past adjustment record...," and "is a significant threat to the safe, secure, normal operation of this institution...." (Id. at p. 8). Plaintiff refused to appear at his next scheduled PRC review of November 20, 2008. (Id. at p. 12).

On May 21, 2009, the PRC at SCI-Albion continued Plaintiff on AC status, concluding that it did "not feel comfortable recommending his release to general population due to his history of escape." (Id. at p. 14). Plaintiff was transferred to SCI-Forest on July 7, 2009, where he was continued on AC status in the RHU; however, he was allowed to have a TV, typewriter, and radio, and was also approved for commissary coffee, soup, and chips. (Id.. at p. 19). At his next periodic review on September 3, 2009, Plaintiff requested an extended visit with his sister, brother and niece. Plaintiff was advised that his request would be considered at his next scheduled PRC review. (Id. at p. 28).

15

Plaintiff's next PRC review was held on October 1, 2009, at which time Plaintiff requested both a phone call and an extended visit. The PRC approved the phone call, but continued Plaintiff on AC status, noting that he was "a danger by/from some person(s) in the institution who cannot be protected by alternative measures," and that his "negative institutional adjustment warrants placement in AC status." (Id. at p. 35). The PRC followed up with a "comprehensive review" of Plaintiff's status on October 20, 2009, at which time Plaintiff was "awarded the latitude and the opportunity to express any and all concerns with the PRC committee," and the committee explained what the RRL is and the rationale for being placed on the list. (Id. at p. 41). The PRC then noted the following:

> [Plaintiff] was reminded that he is a security risk for General Population due to his attempted escapes at SCI Graterford and SCI Smithfield. He has incurred numerous misconducts and has separations from other inmates and institutions. [Plaintiff's] overall adjustment has been extremely poor while in the DOC. It was also explained that only the Secretary of Corrections can remove him from the [RRL].

(Id.).

The foregoing summary of Plaintiff's periodic reviews since he was placed in SCI-Albion's RHU on May 30, 2006, plainly shows that Plaintiff was well aware of the reasons he was confined in the RHU on a continual basis. There is ample evidence in the record to support the PRC's repeated recommendations to have him continued on AC status, given Plaintiff's past history of attempted escape and assaultive behavior. Yet, on October 26, 2007, the PRC was inclined to make a request to have Plaintiff removed from the RRL, in light of Plaintiff's improved adjustment in the RHU. At that time, the PRC informed Plaintiff that he simply needed to remain misconduct-free for the next six months to warrant such a request. (See ECF

No. 79-9 at p. 33). This Plaintiff was unable to do, and the intervening misconduct for fighting caused the clock to restart on his period of positive adjustment.

Thus, the record demonstrates that Plaintiff's continued confinement in the RHU on AC status is supported by evidence sufficient to pass constitutional muster. Moreover, Plaintiff has failed to provide any factual support for his assertions that his PRC reviews were constitutionally inadequate. Accordingly, summary judgment should be granted in favor of Defendants on Plaintiff's Fourteenth Amendment due process claims, and Plaintiff's motion for partial summary judgment on his due process claims against Defendants Repko, Overmyer, and Ray should be denied.

### b. Eighth Amendment Claim Against Defendant Beard

To succeed on an Eighth Amendment claim based on prison conditions, a plaintiff must show "he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994) An objectively, sufficiently serious injury is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, clothing, shelter, and medical care. Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Tillman v. Lebanon County Correctional Facility, 221 F.3d 410, 419 (3d Cir. 2000); Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992)(holding that, at a minimum, correctional institutions must provide inmates with "adequate food, clothing, shelter, sanitation, medical care, and personal safety"). Furthermore, to establish deliberate indifference: 1) a prison official must know of and disregard an excessive risk to inmate health or

safety; 2) the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and 3) the official must also draw the inference. Farmer, 511 U.S. at 837.

Here, Plaintiff alleges that Defendant Beard violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to "constant illumination" during his period of confinement in the RHU. The DOC Defendants respond that the alleged RHU conditions do not deprive Plaintiff of the minimal civilized measure of life's necessities and, thus, do not violate Plaintiff's Eighth Amendment rights. In making this argument, Defendants cite, *inter alia*, the Pennsylvania Superior Court's decision in Rivera v. Pennsylvania Department of Corrections, 827 A.2d 525 (Pa.Super. 2003), in which the court rejected an Eighth Amendment challenge to conditions of confinement in a long term segregation unit ("LTSU"), which included leaving the lights on twenty-four hours a day. Rivera, 837 A.2d at 529-32. The Superior Court's findings in this regard were cited with approval by the Honorable Lisa Pupo Lenihan in Brown v. Beard, 2:07-cv-637, slip op. at * 17 (W.D.Pa. Mar. 9, 2009)(noting that institutions housing "persons convicted of serious crimes cannot be free of discomfort")(citations omitted).

Here, the primary lights at issue are the security night lights in the RHU cells, which contain 9 watt fluorescent bulbs that remain lit 24 hours a day. (See ECF No. 92-1 at p. 58). In response to Plaintiff's discovery requests, Defendant Beard explained that the constant illumination is required for security purposes:

> The purpose of providing a low wattage light bulb is so that staff can better monitor inmates who may present a risk of harm to themselves or

>to others or who may attempt to escape. Individuals in the RHU in
>general present a greater risk of inappropriate and threatening activity.

(See ECF No. 79-1, p. 23 at ¶ 4).

In general, courts have held that constant low intensity lighting, when justified by legitimate penological concerns, does not violate the Eighth Amendment. See, e.g., Stewart v. Beard, 2011 WL 835062, at *2 (3d Cir. Mar. 11, 2011); Chavarria v. Stacks, 102 Fed. Appx. 433, 436-37 (5th Cir. 2004)("policy of constant illumination is reasonably related to the penological interest of guard security"); Brown v. Martinez, 2007 WL 2225842 at * 8 (M.D.Pa. July 31, 2007)("continuous exposure to low wattage night time security lighting may be permissible based on legitimate penological interests, such as prison security concerns"); King v. Frank, 371 F.Supp.2d 977, 984-85 (W.D.Wis. 2005)(constant exposure to a 9 watt fluorescent light that allows prison officials to observe inmates at night did not violate Eighth Amendment).

Based on the foregoing, the Court finds that the constant illumination of the RHU's within the DOC system serves the legitimate penological concern of prison security and, thus, does not violate the Eighth Amendment. Accordingly, summary judgment should be entered in favor of Defendant Beard on Plaintiff's Eighth Amendment claim.

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that:

1. Defendants' motion for summary judgment [ECF No. 78] be granted; and

2. Plaintiff's motion for partial summary judgment [ECF No. 82] be denied.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of some appellate rights. See <u>Nara v. Frank</u>, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: May 31, 2011

cc: The Honorable Sean J. McLaughlin
United States District Judge