**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HECTOR HUERTAS, )
)
                Plaintiff, )     Case No. 1:10-cv-10-SJM-SPB
)
     v. )
)
JEFFREY BEARD, et al., )
)
              Defendants. )


**<u>MEMORANDUM OPINION</u>**

McLAUGHLIN, SEAN J., District J.,

      Plaintiff Hector Huertas filed this civil action on January 12, 2010 pursuant to 42

U.S.C. §1983. His Second Amended Complaint [19], the operative pleading in this

case, alleges violations of his procedural due process and Eighth Amendment rights

arising from his continued confinement in segregated housing at various state

correctional institutions since October of 2002. He has sued Jeffrey Beard, former

Secretary of the Pennsylvania Department of Corrections, as well as various DOC

officials employed at SCI-Albion or SCI-Forest.

      Presently pending before the Court are the parties' cross-motions for summary

judgment. On May 31, 2011, the U.S. Magistrate Judge Susan Paradise Baxter entered

a Report and Recommendation [99] recommending that the Defendants' motion for

summary judgment be granted and the Plaintiff's cross-motion for partial summary

judgment be denied. Plaintiff filed objections to the R&R on June 16, 2011 ([103] and

[104]). Subsequently, on November 10, 2011, Plaintiff filed "Additions to the Record"

[106]. He also filed, on April 16, 2012, a Motion Requesting Leave of Court to

Supplement the Record and Consolidated Memorandum of Law [107], which this Court granted on July 31, 2012. All of these materials have been reviewed on a *de novo* basis by this Court.[1]

Having considered the foregoing, the Court concludes that the Defendants' are entitled to summary judgment essentially for the reasons expressed in the Magistrate Judge's Report and Recommendation. Nevertheless, given the size of the record before me, including Plaintiff's prolific objections and other filings, I find that substantial additional commentary is warranted.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir.2009) (citation omitted), and a factual dispute is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49, 252 (1986). Accordingly, in order for a claim to survive summary judgment, "there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." *Id.*

---

[1] When objections are filed to a Magistrate Judge's Report and Recommendation, we review de novo the portions of the report to which objections are made. 28 U.S.C. § 636(b)(1)(c). Written objections to an R&R must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections." M.D. Pa. Local R. 72.3. We may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); M.D. Pa. Local R. 72.3.

## II.    BACKGROUND

Plaintiff is serving a life sentence for first degree murder and related charges stemming from an incident in which he and two other masked assailants fired weapons (including an AK-47) at a vehicle parked on the streets of Philadelphia.  Plaintiff has been incarcerated in the custody of the Pennsylvania Department of Corrections since he was originally received at SCI-Graterford on July 26, 1999.

During his first three and 1/2 years of incarceration, Plaintiff was found guilty of seven misconducts, including abusive/obscene language, fighting, refusing to obey an order, possession of contraband, and attempted escape.  (Defs.' Ex. D [79-5] at pp. 2-3.)  The latter misconduct involved an October 28, 2002 incident in which Plaintiff and another inmate were discovered on top of a prison building in the possession of a 39-foot rope with a grappling hook, civilian clothing and maps.  (Defs.' Ex. E [79-6] at 1-32; Ex. E-1 [79-7] at pp. 1-33.)  This incident led to Plaintiff's criminal conviction for attempted escape and his subsequent transfer from SCI-Graterford to SCI-Greene. (Defs.' Ex. H [79-8] at pp. 12-31.)

Since Plaintiff's attempted escape on October 28, 2002, he has been continuously confined to Security Level 5 Housing in the Restricted Housing Unit ("RHU") on either administrative custody ("AC") or disciplinary custody ("DC") status. While awaiting his transfer to SCI-Greene, Plaintiff received two misconducts for assaulting corrections officers.  (Defs.' Ex. D [79-5] at p. 2.; Ex. I [79-9] at pp. 2-4; Ex. J [79-9] at pp. 6-7.)

Following his transfer to SCI-Greene, Plaintiff became entrenched with the Latin Kings, a Security Threat Group.  After the security office at SCI-Greene received

information that he was responsible for directing a gang hit on another inmate,[2] Plaintiff underwent an administrative separation transfer to SCI-Frackville. (Defs.' Ex. N [79-9] at p. 17.)

Within Plaintiff's first few months at SCI-Frackville, the Security Office received information that Plaintiff was planning gang assaults on three inmates. Plaintiff also received a misconduct on March 30, 2004 for possession of contraband. (Defs.' Ex. D at p. 2.) As a result of the Security Office's investigation into the alleged gang hit, Plaintiff underwent an administrative custody transfer to SCI-Smithfield, where he was received on June 15, 2004.

Within one month following his arrival at SCI-Smithfield, security officers received confidential information that Plaintiff and two other inmates were planning an escape attempt. The information received was that Plaintiff and the other two named inmates knew each other from the street and were involved in the same crime. (See Defs.' Ex. O [79-9] at p. 19.) After further investigation corroborated Plaintiff's association with the two other inmates, the Security Office recommended a separation transfer. (Id.) While awaiting transfer to the Long Term Segregation Unit (LTSU) at SCI-Fayette, Plaintiff received a misconduct and 90 days' disciplinary custody for throwing an unknown liquid mixture (which appeared to be urine and feces) through another inmate's food aperture, striking the inmate on the leg. (Defs.' Ex. C-1 [79-2] at p. 46, Defs.' Ex. K [79-9] at p. 9.)

On April 12, 2005, Plaintiff was received into the LTSU at SCI-Fayette. On November 23, 2005, in light of his improved conduct, it was recommended that Plaintiff

---

[2] The inmate was stabbed six times, resulting in serious injury. The Security Department at SCI-Greene received information from a confidential informant it considered reliable that Plaintiff had directed the "hit" in retaliation for the inmate's testimony in a case. (See Defs.' Ex. L [79-9] at p. 13.)

4

be released from the LTSU and transferred to a Level 4 institution for longer-term administrative custody inmates.  (See Def.'s Ex. P [79-9] at pp. 21-23.)

Accordingly, Plaintiff was released from the LTSU on May 30, 2006 and transferred to administrative custody at SCI-Albion.  (Defs.' Ex. Q [79-9] at p. 25.) During his meeting with the Program Review Committee ("PRC" or "Committee") on October 26, 2007, the Committee discussed with Plaintiff his request to get out of the RHU and into general population.  Plaintiff was told that, although no promises could be made, the Committee would seriously consider recommending his removal from the Restricted Release List ("RRL")[3] if he remained misconduct-free for the next six months. (Defs. Ex. C-2 [79-3] at p. 44.)  Plaintiff was reminded again during his February 21, 2008 PRC review that he needed to remain misconduct-free for three more months in order for the Committee to consider recommending his removal from the RRL.  (Id. at p. 46.)

Unfortunately, on March 18, 2008, Plaintiff received a misconduct for fighting with another inmate, for which he received 60 days of disciplinary custody.  (Defs.' Ex. D [79-5] at p. 2.)  On May 16, 2008, having completed his disciplinary custody time, Plaintiff was transferred back into administrative custody.   (Defs.' Ex. C-3 [79-4] at p. 2.)

On July 7, 2009, Plaintiff was transferred to the RHU at SCI-Forest, where he remains in administrative custody.  (Defs.' Ex. C-3 [79-4] at p. 19.)  He filed this action on January 12, 2010.

---

[3] According to DC-ADM 802, the "Restricted Release List" is "[a] list of inmates who are restricted from release from AC status without the prior approval of the Secretary [of Corrections or his] designee.  An inmate may be placed on this list when he/she poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern."  (See Defs.' Ex. A [79-1] at p. 19.)

Although Plaintiff has been continually confined in the RHU setting since October 28, 2002, his claims in this lawsuit concern only the period of segregation beginning April 12, 2005, when he was transferred to the Long-Term Segregation Unit ("LTSU") at SCI-Fayette. Count 1 of the Second Amended Complaint asserts a due process violation on the part of Defendant Beard relative to Plaintiff's confinement in the LTSU from April 12, 2005 to May 30, 2006. Count 2 asserts a due process violation on the part of Beard based upon Beard's alleged decision to place Plaintiff in "indefinite" confinement in the RHU on long-term administrative custody ("AC") status following his release from the LTSU. Counts 3 and 4 allege due process violations on the part of Beard premised upon Beard's alleged decision to continue Plaintiff on AC status following his review of Plaintiff's prison record on (respectively) November 24, 2008 and May 29, 2009. Count 5 alleges an Eighth Amendment violation on the part of Beard premised upon the conditions of Plaintiff's confinement in the RHU, particularly his subjection to continuous illumination. Counts 6 and 7 assert due process violations on the part of various DOC officials employed at SCI-Albion and SCI-Forest premised upon Plaintiff's continued confinement at those facilities in the RHU.

## III.    DISCUSSION

Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983,[4] which does not create substantive rights but instead "provides only remedies for deprivations of rights

---

[4] This statute provides a private right of action as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [U.S.] Constitution and laws.

42 U.S.C. § 1983.

established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To prevail under § 1983, a plaintiff must prove that he suffered the deprivation of a right secured by the United States Constitution or federal law by a person acting under color of state law. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995). Here, the only disputed legal issue is whether Plaintiff has produced sufficient evidence to establish the violation of his federal rights – namely, his right to due process under the Fifth and Fourteenth Amendments and his Eighth Amendment right to be free from cruel and unusual punishment. We consider each of these legal theories in turn.

A.

In order to demonstrate a violation of the right to procedural due process, a plaintiff must show (1) that the state deprived him of a protected interest in life, liberty, or property; and (2) that the deprivation occurred without due process of law. *Burns v. PA Dept. of Correction*, 544 F.3d 279 (3d Cir.2008). In the prison setting, protected liberty interests are generally limited to "freedom from restraint which … imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Like the Magistrate Judge, I am willing to assume that Plaintiff has suffered a deprivation of his constitutionally protected liberty interests by virtue of his extended confinement in administrative custody. See *Shoats v. Horn,* 213 F.3d 140, 144 (3d Cir. 2000) (holding that a prisoner who spent eight years in administrative custody, without any prospect of immediate release back into the general population, had suffered the type of deprivation which was "'atypical' in relation to the ordinary incidents of prison

life" and therefore subject to due process considerations). *Cf. Griffin v. Vaughn,* 112 F.3d 703, 705–07 (3d Cir.1997) (ruling that fifteen months in segregation was not an atypical and significant hardship); *Smith v. Mensinger,* 293 F.3d 641, 654 (3d Cir.2002) (holding that seven months in disciplinary confinement did not implicate a protected liberty interest).

However, this merely begs the question what process is constitutionally "due." In *Hewitt v. Helms,* 459 U.S. 460 (1983), the Supreme Court held that the removal of an inmate from the general population into administrative segregation requires "only an informal nonadversary review of evidence," 459 U.S. at 474, which is satisfied when an inmate receives "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476. No oral hearing is required, and a written statement by the inmate will satisfy this requirement. *Hewitt v. Helms*, 459 U.S. at 476; *Stevenson v. Carroll,* Civ. Action No. 04-139-GMS, 2011 WL 6842955 at *12 (D. Del. Dec. 29, 2011). Moreover, given the exigencies inherent in prison management, post-deprivation process is satisfactory, and the proceeding must merely occur "within a reasonable time following an inmate's transfer." *Hewitt,* at 476 n.8; *Stevenson v. Carroll,* 495 F.3d at 71.

Furthermore, in assessing the penological reason for the placement of a prisoner in administrative custody, federal courts have adopted a deferential approach. As the court stated in *Shoats,* an inmate "[can] conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct." 213 F.3d at 146. And federal courts "are unwilling to substitute [their] judgment on these difficult

and sensitive matters of institutional administration and security for that of 'the persons who are actually charged with and trained in the running' of such facilities." *Block v. Rutherford*, 468 U.S. 576, 588 (1984) (*quoting Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

Finally, our Circuit Court of Appeals has upheld the constitutionality of DC ADM-802, which sets forth the Pennsylvania DOC's policies and procedures for confining inmates to administrative custody and the PRC's periodic review of their status. *See Shoats v. Horn*, 213 F.3d 140, 145–46 (3d Cir.2000). *See also Sharp v. Johnson,* 669 F.3d 144, 160 n. 23 (3d Cir. 2012). In order to overcome the Defendants' motion for summary judgment, therefore, it is incumbent upon Plaintiff to demonstrate a genuine issue of material fact within the record that would support a finding that the Defendants failed to abide by that policy in a manner that violated fundamental due process principles.

In this case, the summary judgment record includes documentation of Plaintiff's regular periodic reviews by the Program Review Committee ("PRC") since he was first placed in segregation in October of 2002. Despite this, Plaintiff has filed lengthy objections in regards to the Magistrate Judge's ruling, as well as other post-R&R materials, in support of his claim that his due process rights have been violated. Although Plaintiff's objections are expansive and somewhat disjointed, we will address seriatim what we perceived to be his more salient complaints.

(i)

Plaintiff objects that the Magistrate Judge erred by going out of her way to make arguments in favor of summary judgment which had not been raised by the Defendants. Having reviewed the R&R in light of the entire summary judgment record, I disagree.

9

With regard to each of Plaintiff's due process claims at Counts 1, 2, 3, 4, 6 and 7, the Magistrate Judge recommended judgment in favor of the Defendants either on statute-of-limitations grounds (Count 1) or because she concluded that Plaintiff had received all of the process to which he was entitled as a matter of federal due process law (Counts 2, 3, 4, 6 and 7). Both grounds were expressly raised by the Defendants in their motion for summary judgment, and the Magistrate Judge's analysis was fairly within the scope of the issues joined by the parties. Therefore, this particular objection lacks merit.

(ii)

Plaintiff objects that the Magistrate Judge erred in her recitation of the procedural history of the case in that she failed to acknowledge his brief in opposition to the Defendants' motion for summary judgment, which he contends is Document # 92, but which actually appears to be Document # 93. (See Pl.'s "Brief In Support of Plaintiff's Concise Statement of Disputed Facts in Response to Defendants' Concise Statement of Facts Not in Dispute" [93].) Since Plaintiff styled this document as a brief in support of his own Concise Statement of Disputed Facts, it is perhaps not surprising that the brief was not recognized as having been filed in opposition to the Defendants' cross-motion for summary judgment; nevertheless, it is clear that the Magistrate Judge considered the Plaintiff's other filings and properly construed them as an attempt to point out aspects of the record that were being disputed by the Plaintiff. Moreover, this Court has considered the entire summary judgment record on a *de novo* basis, including Plaintiff's brief in opposition to the Defendants' motion. Therefore, any procedural error on the part of the Magistrate Judge in this regard has been cured.

10

Plaintiff also takes issue with the Magistrate Judge's statement that "Plaintiff has countered Defendants' motion by filing a partial motion for summary judgment." (R&R [99] at p.3.) Plaintiff insists that his own partial motion for summary judgment was filed not in opposition to Defendants' own motion, but as a Rule 56 motion in its own right, based on the absence of a genuine issue of material fact entitling him to judgment as a matter of law. However, this objection is more about semantics than substance. The wording used by the Magistrate merely reflects that the parties' positions were in opposition, and it does not suggest she failed to apply the proper standard of review in considering Plaintiff's own motion for summary judgment. Having reviewed all the relevant documents *de novo*, I find Plaintiff's objections as to the procedural history meritless inasmuch as Plaintiff has not demonstrated any specific prejudice caused by the alleged errors of which he complains.

(iii)

We next consider Plaintiff's objection that the Magistrate Judge erred in crediting the Defendants' version of his misconduct history. Plaintiff does not appear to dispute the fact that he has been found guilty of some fourteen misconducts over the course of his confinement, nor does the record support a finding of lack of due process in connection with those misconducts. Similarly, there is no dispute about the fact that Plaintiff was convicted for attempting an escape from SCI-Graterford. Rather, Plaintiff disputes the Defendants' contention that he directed a gang hit while incarcerated at SCI-Greene, planned a gang assault while at SCI-Frackville, and was planning a second escape attempt while at SCI-Smithfield. Plaintiff objects that the Magistrate Judge never considered his positive behavior and also failed to consider that Plaintiff

was never charged with misconducts relative to the gang assaults and/or the Smithfield attempted escape. These objections are misplaced.

For starters, Plaintiff's disputes about his alleged conduct while at SCI-Greene, SCI-Frackville, and SCI-Smithfield are immaterial in light of the legal issues at hand and the undisputed evidence concerning Plaintiff's prison record. Although the disputed incidents of suspected gang-related misconduct resulted in separation transfers for Plaintiff,[5] it is not clear that they resulted in any greater deprivation of the his liberty beyond that which he was already experiencing by virtue of his AC status, which in turn stemmed from his overall prison record, including numerous misconducts for assaultive or abusive behavior, legitimate separation needs, and, most significantly, his attempted escape from SCI-Graterford. (See Defs.' Ex. C-1 [79-2] at pp. 2-26, 32-36, 41-46; Ex. C-2 [79-3] at pp. 4, 5, 37, 41, 44, 45; Ex. C-3 [79-4] at pp. 3, 8, 13-15, 17.)

Moreover, while Plaintiff insists that the contested gang-related activities were "not made known to him" and have been *secretly* "held over his head" as an excuse to keep him in an indefinite state of segregation, this is belied by the record. For example, it is clear from Plaintiff's own submissions to prison authorities that he was made aware at his June 23, 2004 PRC hearing of the allegation concerning his involvement with the gang hit at SCI-Greene. On June 24, 2004, the day after his PRC review, Plaintiff wrote the Superintendent of SCI-Smithfield a letter in which he flatly denied any knowledge of

---

[5] Plaintiff's various separation transfers do not implicate any constitutionally protected liberty interest, since Plaintiff is not entitled to be housed at any particular institution within the Pennsylvania Department of Corrections. *See Meachum v. Fano,* 427 U.S. 215, 216 (1976) (holding that no liberty interest under the Due Process Clause of the Fourteenth Amendment is infringed upon when an inmate is transferred, with or without a hearing, to another state correctional institution with substantially less favorable conditions), *reh'g denied,* 429 U.S. 873 (1976); *Hookey v. Lomas,* Civil No. 1:CV–08–02284, 2010 WL 1009946 at *6 (M.D. Pa. March 11, 2010) ("It is well-settled that a prisoner has no justifiable expectation that she will be incarcerated in a particular prison or facility.") (citing authority); *Dantzler v. Beard,* Civil Action No. 05-1727, 2007 WL 5018184 at *5 n. 9 (W.D. Pa. Dc. 6, 2007)

the incident and requested a transfer from the RHU into general population. (Defs.' Ex. C-1 [79-2] at pp. 27-29.) In his reply dated June 30, 2004, Superintendent John A. Palakovich indicated his concurrence with the PRC's assessment, "based on a review of [Plaintiff's] past adjustment and overall record," that Plaintiff posed a "threat to the security of the institution" and that "a longer period of positive adjustment in AC status [would be] necessary prior to consideration of [Plaintiff's] release to population." (Id. at p. 26.)[6] Again on July 26, 2004, in response to Plaintiff's complaints to the DOC's Office of Professional Responsibility, Superintendent Palakovich commented on Plaintiff's denial of the SCI-Greene incident and the propriety of Plaintiff's continued placement in administrative custody:

> … You were placed on Administrative Custody at SCI-Greene following the expiration of your DC sanction you served as a result of your attempted escape from SCI-Graterford and subsequent misconduct report associated with that attempt. You remained on Administrative Custody as a result of your reported involvement in an assault on another inmate at SCI-Greene. You have denied any involvement in said assault; however, staff at SCI-Greene determined this to be a risk to the security of that institution and were justified in transferring you. Upon your arrival at SCI-Frackville, you remained on AC based on the seriousness of your transfer from SCI-Greene and separation needs at SCI-Frackville, which were determined to be legitimate. This resulted in your transfer to SCI-Smithfiled and subsequent continuation of your Administrative Custody. On 6/23/04, PRC reviewed your case and made the determination that due to your escape history and history of assaultive behavior throughout your incarceration, you would pose a risk to the safety and security of the institution and chose to continue that status here. On 6/30/04, I concurred with that decision. I also agreed that a longer period of positive adjustment in Administrative Custody was necessary prior to your release to population. These decisions are consistent with the provisions of **DC-ADM 802, Administrative Custody** and are appropriate in your case.

(Id. at p. 34.)

---

[6] Superintendent Palakovich's decision was subsequently appealed by Plaintiff and upheld by the Chief Hearing Examiner. (See Defs.' Ex. C-1 [79-2] at p. 33.)

Similarly, the record reveals that Plaintiff was made aware of the concern about his supposed plan to attempt an escape from SCI-Smithfield, as Plaintiff disputed this information at his June 2, 2006 PRC hearing.  (See Defs.' Ex. C-2 [79-3] at p. 37.)

Ultimately, the question for this Court is not whether Plaintiff engaged in the uncharged gang-related misconduct but whether his prolonged placement in administrative custody is reasonably related to legitimate penological concerns and whether he received basic due process in connection with that placement.  Where matters of prison security are involved, the Supreme Court has instructed that federal courts must take a deferential approach:

> [i]In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like.  In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents.  The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior.

*Hewitt, supra,* 459 U.S. at 474.

Accordingly, to the extent Plaintiff seeks an opportunity, under the guise of a due process claim, to litigate his alleged gang-related misconduct and/or intended escape from Smithfield, his objection is unfounded.

(iv)

Count 1 of the Second Amended Complaint pertains to Plaintiff's confinement to the Long Term Segregation Unit at SCI-Fayette from April 12, 2005 to May 30, 2006. Plaintiff alleges that he was arbitrarily placed in the LTSU under punitive conditions

14

without any legitimate penological justification and without constitutionally adequate periodic reviews. (See Second Amended Compl. [19] at ¶¶ 35-48, 261.)

In her R&R, the Magistrate Judge recommended dismissal of this claim based upon statute-of-limitations grounds. Plaintiff has objected to the recommendation on the theory that Count 1 is timely under the continuing violation doctrine inasmuch as his confinement in the LTSU was merely a continuation of his administrative segregation which has been ongoing since 2002. He contends that the Magistrate Judge erred insofar as she treated his time in the LTSU as different from his segregation in the RHU. (See Pl.'s Objections to R&R [103] at p. 2 ("[Plaintiff's] LTSU seg[regation] is the same as in the RHU, and [it] would be error to hold otherwise as if they were separate seg[regations].")). The record supports the view that Plaintiff's custody status did not change upon his placement in the LTSU at SCI-Fayette; indeed, Superintendent Harry E. Wilson specifically informed Plaintiff of as much on July 15, 2005. (*See* Defs.' Ex. C-2 [79-3] at p. 17 (letter from Superintendent Wilson to Plaintiff advising him that, "Your transfer from SCI-Smithfield to SCI-Fayette did not change your custody status. The actions taken at SCI-Fayette were merely a continuation of your custody status upon transfer to this institution.").) In light of this evidence, and because I prefer to address Plaintiff's first cause of action on the merits, I decline to adopt Part II(D)(1) of the R&R insofar as it recommends the dismissal of Count 1 on lack-of-timeliness grounds.

Nevertheless, I conclude that judgment in favor of Defendant Beard is appropriate with respect to Count 1 for other reasons. First, to the extent Plaintiff is alleging that he was arbitrarily placed in the LTSU without any penological reason, the record belies this contention. In fact, the record demonstrates that Plaintiff, frustrated

with his continuation on AC status at SCI-Smithfield, requested a transfer to either the Special Management Unit or the LTSU as early as July 28, 2004 in order to (in his words) "really [be] given a chance to show my good behavior." (Defs.' Ex. C-1 [79-2] at pp. 37-38.) A PRC report from August 19, 2004 confirms that Plaintiff desired "consideration for LTSU and some cell study." (Id. at p. 41.) Thus, even if Plaintiff could establish that Beard was personally involved in his transfer to the LTSU, his claim that Beard transferred him without notice or reason is untenable on this record.

Second, as we have just observed (and as Plaintiff himself has argued), Plaintiff's custody status was not fundamentally changed upon his placement in the LTSU. While the conditions in the LTSU may have been more restrictive than the conditions Plaintiff had previously experienced in the RHU at SCI-Smithfield, Plaintiff has not established that, by virtue of that transfer, he suffered a deprivation of any constitutionally protected liberty interest beyond that which he may have been already experiencing by virtue of his administrative custody status.[7] Thus, Plaintiff has failed to establish his entitlement to a separate due process hearing relative to his transfer to the LTSU at SCI-Fayette beyond the 90-day PRC reviews which he was already receiving.[8] Since Plaintiff received PRC hearings on April 13, July 6, September 29, and December 22 of 2005 and as well as March 16, 2006 (all of which he attended), see Defs.' Ex. C-2

[7] At the time Plaintiff was placed in the LTSU, he had been segregated from general population for almost 33 months. We will assume for the sake of argument, without deciding, that the duration of his Level 5 confinement up to that point constituted the type of atypical hardship that would give rise to a protectable liberty interest. But see Jones v. Baker, 155 F.3d 810, 813 (6th Cir.1998) (confinement in administrative segregation for two and one-half years is not "atypical and significant" hardship giving rise to constitutionally protected liberty interest).

[8] To the extent Plaintiff could establish that his time in the LTSU constituted a separate and distinct liberty deprivation giving rise to a plausible due process claim, such claim would be barred by the statute of limitations, and we would be inclined to adopt the Magistrate Judge's recommendation along those lines.

[79-3] at pp. 6, 16, 24, 31-32, the record confirms that Plaintiff received the process to which he was entitled during his time in the LTSU.

Although Plaintiff has alleged that these hearings were "inadequate, perfunctory and sham reviews," these conclusory allegations are unsupported by the record. Plaintiff alleges in his Second Amended Complaint that he was given a "vague invalid excuse" for his continuation on AC status in the LTSU – namely, the representation by PRC members that his prison records were unavailable to determine his custody status. (See SAC [19] at ¶ 44.) Plaintiff contends that his records were, in fact, transferred from SCI-Smithfield to SCI-Fayette and that the unavailability of his file was simply offered as an excuse to keep him confined in administrative segregation indefinitely. However, it appears Plaintiff is merely misinterpreting the section of his PRC Reports (entitled "Initial Reason for Confinement") wherein PRC members simply restate (in every report) the basis upon which Plaintiff was *initially* placed in administrative segregation upon his arrival at SCI-Fayette – i.e., his file was being transferred and he had not yet been fully processed for a more definitive placement within the institution. (See DC-ADM 802, § I(A)(j), Defs.' Ex. A [79-1] at p. 8 (stating that an inmate may be assigned AC status and placed in a Security Level 5 Housing Unit where, among other things, "no records and/or essential information are available to determine the inmate's custody level or housing needs…").)

In any event, Plaintiff had an opportunity while in the LTSU to be heard concerning this particular complaint. Following his PRC meeting on July 6, 2005, Plaintiff appealed the Committee's recommendation to the Superintendent. Objecting to his continued placement in the LTSU, Plaintiff specifically cited his concerns about the

alleged unavailability of his prison records as well as an inaccurate remark by PRC members to the effect that Plaintiff had been placed in the LTSU due to an assault on another inmate.[9]  By letter dated July 15, 2005, Superintendent Wilson advised Plaintiff that his LTSU placement was simply a continuation of his ongoing AC status and that "[c]ontinued positive adjustment, while in your current custody status, must be demonstrated prior to any favorable consideration of your release from the LTSU." (Defs.' Ex. C-2 [79-3] at p. 17.)  Records show that Plaintiff's behavior did continue to improve, resulting in additional privileges and, ultimately, his release from the LTSU on or about May 30, 2006.  (Id. at pp. 10-11, 20-33.)

Because the record does not support a procedural due process violation relative to Plaintiff's time in the Long Term Segregation Unit, summary judgment will be entered in favor of Defendant Beard as to Count 1 of the Second Amended Complaint.

(v)

Plaintiff's second cause of action alleges a due process violation on the part of Beard based on Plaintiff's transfer from the LTSU at SCI-Fayette to (what Plaintiff terms) "indefinite AC status."  According to the Second Amended Complaint, Beard became aware, following a January 22, 2006 review of Plaintiff's records, that Plaintiff had been receiving inadequate periodic reviews and was being held in AC status arbitrarily and without penological justification, yet Beard nevertheless placed Plaintiff on "long term AC status under his orders that Plaintiff cannot be released without his approval."  (SAC ¶ 262.)  Moreover, it is alleged, Beard never provided Plaintiff with a

---

[9] In fact, as we have noted, infra at n. 3, Plaintiff was already awaiting a transfer to the LTSU per his own request when he received a 90-day DC sanction for throwing an unidentified liquid into the pie-hole of an adjacent cell.  (See Defs.' Ex. C-1 [79-2] at p. 46.)

hearing or opportunity to be heard "before the final decision maker" (i.e, Beard himself) before making the decision to continue Plaintiff in the RHU on Long Term AC Status indefinitely." (Id.) Plaintiff objects that the Magistrate Judge erred in recommending summary judgment for Defendant Beard as to Count 2.

With respect to this claim, it appears that Plaintiff is actually complaining about his placement on the Restricted Release List and alleged lack of basic due process in connection with that decision. But Plaintiff's due process claims in Counts 1-4, 6, and 7 pertain to his RHU confinement from April 12, 2005 onward, whereas the record establishes that Plaintiff was placed on the RRL at some point prior to March 26, 2004.[10] Thus, to the extent Plaintiff interprets his placement on the RRL as the equivalent of a decision to place him in indefinite administrative segregation, the operative decision predates the time period covered by Plaintiff's claims and is time-barred.

Furthermore, Plaintiff is mistaken insofar as he assumes that his placement on the RRL implicated a constitutionally protected due process right. Per DOC policy, the RRL is simply

> [a] list of inmates who are restricted from release from AC status without the prior approval of the Secretary [or his] designee. An inmate may be placed on this list when he/she poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern.

(Defs.' Ex. A [79-1] at p. 19.) As one court has explained,

> [Both] RRL and non-RRL inmates have their custody status periodically reviewed by the [Program Review Committee]. Non-RRL inmates can be released into general population by the PRC or Superintendent. *See* DC-ADM 802, Section 4(A). Release of an RRL inmate into general population, however, requires the

---

[10] The earliest reference to Plaintiff's placement on the RRL occurs on March 26, 2004, indicating that he must have been placed on the RRL at some point prior to that time. (See Pl.'s App. 3 [85-2] at p. 11 ¶ 3.)

19

> approval of the Secretary of correction or his or her designee, though the PRC may recommend release. *See id.* In all other respects, RRL inmates are treated identically to their non-RRL counterparts on AC-status.

*Leaphart v. Palakovich,* 3:11-CV-1333, 2012 WL 175426 at *3 (M.D. Pa. Jan. 20, 2012).

Thus, placement on the RRL merely adds another layer of review relative to the decision to release an inmate from administrative custody back to general population; it does not involve any added deprivation of liberty as to which due process rights attach. *See Bowen v. Ryan,* 248 Fed. Appx. 302, 304 (3d Cir. 2007) (affirming dismissal of prisoner's claim that he was placed on the RRL without due process because "[p]lacement on the List did not deprive Bowen of his liberty, privileges, or any other constitutionally protected liberty interest"); *Carter v. Beard,* 2012 WL 1414446 at *3 (M.D. Pa. April 24, 2012) (noting that the "Third Circuit has held … that placement on the RRL does not deprive an inmate of a liberty interest triggering due-process protection") *(citing Bowen, supr*a, at 304); *Leaphart, supra,* at *3 ("Plaintiff's placement on RRL did not violate his due process rights since it did not impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."). Accordingly, even if Plaintiff never received a separate notice and hearing relative to his placement on the RRL, no due process violation occurred with respect to that particular administrative decision.

Plaintiff is also incorrect in assuming that, by virtue of his placement on the RRL, he is entitled to a personal hearing before Defendant Beard. While DC-ADM 802 renders the Secretary of Corrections or his designee the final decision-maker concerning the release of a prisoner from AC status, due process is satisfied if the prisoner is given an opportunity to be heard by the PRC, since the PRC can make a

20

recommendation concerning the prisoner's release from administrative custody and, therefore, has a voice in the decision-making process. This concept was explained in *Bowen v. Ryan,* No. 3:05CV1512, 2006 WL 3437287 (M.D. Pa. Nov. 29, 2006), *aff'd,* 248 Fed. Appx. 302 (3d Cir. 2007), wherein the district court rejected a challenge similar to the one being made here:

> Plaintiff's twenty years in administrative confinement clearly creates an "atypical and significant hardship in relation to the ordinary incidents of prison life," but that finding does not end the inquiry for purposes of procedural due process. *See Shoats [v. Horn,* 213 F.3d 140 (3d Cir. 2000)]. The question then becomes what process a prison setting requires. Such process must include "some notice of the charges against [a prisoner] and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative custody." *Id.* (*quoting Hewlitt v. Helms*, 459 U.S. 460, 476, 103 S. Ct. 864, 74 L.Ed.2d 675 (1983)). In most cases, a written statement from the prisoner challenging the reasons for his placement in a particular setting is sufficient to protect due process rights, as long as "the decision maker reviews the charges and then-available evidence" against the prisoner. *Id.*

> The procedure afforded the plaintiff in relation to the Restricted Release List met these due process requirements. While the amended version of DC-ADM 802 prevents the PRC from ordering the removal of a prisoner from the RRL and thus limits the ability of that body to order the placement of a prisoner in the general population, such restrictions do not undermine the procedural rights due the plaintiff to the degree that he could make out a procedural due process claim. Plaintiff enjoys a hearing on his status every ninety days before the PRC. Before the change in policy in May 2004, plaintiff, as he admits, could challenge his status on the RRL before the Council. The PRC's review of his status provided him with sufficient notice of the charges against him and gave him adequate opportunity to challenge those charges. *Transfer of the final decision on whether to remove the plaintiff from the RRL to the Secretary from the PRC does not make the procedure deficient*, since plaintiff had notice in the regulations of the changed status, and an opportunity to make his case to the PRC that he no longer belonged on the list. *Due Process for prisoners does not include the right to determine who the ultimate decision-maker in their cases is, but simply the right to present a case to a body that helps to determine that claim. See Shoats,* 213 F.3d at 145 (holding that "an inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative

> segregation."). Given the minimal nature of the due process required for
> prisoners, we fail to see how the new procedures used by the
> Pennsylvania Department of Corrections undermines plaintiff's
> constitutional rights.

2006 WL 3437287 at *5 (emphasis added).

Nor are Plaintiff's "indefinite segregation" claim rendered any more viable (as he seems to believe) by the mere fact that Defendants have been unable to locate the records documenting Plaintiff's initial placement on the RRL. In discovery, Defendant Beard stated that he could not recall the particulars about why Plaintiff was placed on the Restricted Release List, nor was he able to locate the records documenting Plaintiff's placement on the List. Plaintiff appears to construe this as an indication that there was no reason for him to be placed on the RRL and, therefore, he could not have been informed of the reason for his placement on the List.

Plaintiff's logic is flawed. As we have already noted, placement on the RRL is not a separate liberty deprivation for which due process is required; rather it merely alters the decision-making process concerning the transfer of an inmate from AC status to general population. Accordingly, the lack of records concerning Plaintiff's initial placement on the RRL is beside the point; what is important is the decision-making process as it pertains to Plaintiff's placement in administrative segregation. Plaintiff is not alleging a due process deprivation relative to his initial placement into administrative custody following his 2002 escape attempt and, since that time, he has received regular reviews by the PRC.

In addition, the fact that the record documenting Plaintiff's original placement on the RRL cannot be located does not compel the conclusion that there was no valid reason for Plaintiff's placement on the List. Again, the record establishes that Plaintiff

was placed on the List sometime prior to March 26, 2004. As of March 2004, Plaintiff's prison record included numerous misconducts for assault, fighting, refusing orders, and attempted escape from SCI-Graterford. Plaintiff was also considered to be deeply entrenched with a Security Threat Group and was suspected of having directed a gang hit. As DC-ADM 802 makes clear, RRL designation is appropriate for inmates who pose a threat to the secure operation of the facility that cannot be alleviated by a transfer to another facility. (Defs.' Ex. A [79-1] at p. 19.) Criteria for placement on the RRL include, among other things, assaultive history against staff or other inmates, "escape history or serious escape attempt," and/or threat to the orderly operation of the institution. Given the fact that each of these criteria were a part of Plaintiff's prison record from 1999 through 2004, it is hardly surprising that he wound up on the RRL. Accordingly, Plaintiff's objections relative to his placement on the RRL are without merit.

(vi)

Plaintiff's remaining due process claims relate to his continuing segregation following his transfer to SCI-Albion and, later, SCI-Forest. Count 6 alleges that various officials at SCI-Albion and SCI-Forest denied Plaintiff due process by failing to give him any meaningful notice of the reasons for his continued segregation and/or an opportunity to be heard before Defendant Beard (the "final decisionmaker"). (SAC at ¶ 266.) Count 7 alleges derivative supervisory liability for these violations on the part of Defendants Sobina and Barone, the respective Superintendents of SCI-Albion and SCI-Forest. (Id. at ¶ 267.) Counts 3 and 4 pertain to Beard's allegedly wrongful conduct in allowing Plaintiff to remain on AC status following records reviews conducted (respectively) on November 24, 2008 and May 29, 2009. (SAC ¶¶ 263-64.)

These remaining due process claims center around three separate occasions in which Plaintiff contends that he did not receive adequate notice or opportunity to respond concerning his continued placement into administrative segregation, namely: (a) upon his transfer to the RHU at SCI-Albion on May 30, 2006; (b) upon his return to AC status on May 16, 2008 following his completion of 60 days' disciplinary custody for fighting; and (c) upon his transfer to the RHU at SCI-Forest on or around July 7, 2009. In objecting to the Magistrate Judge's treatment of Counts 3,4, 6 and 7, Plaintiff posits numerous arguments – *to wit*, there was no valid security concern to justify his continued placement on AC status, the notices given to him concerning his transfers were deficient and thereby deprived him of his right to effectively defend himself against continued placement in administrative segregation, no formal deliberations occurred on the part of PRC members relative to the factors which DC-ADM 802 has listed as relevant to placement in administrative segregation, PRC members did not afford Plaintiff an adequate opportunity to speak during his meetings with them, and/or Plaintiff was denied a personal meeting with Beard, the final decision-maker. After careful review of the record before me, I find that these objections lack merit and that Plaintiff's remaining due process claims are insufficient to withstand summary judgment.

At the heart of Plaintiff's due process claims is his disagreement with the determination of various DOC officials that his ongoing AC status is justified by continuing security concerns. While Plaintiff acknowledges that he was originally placed in AC because of his attempted escape from Graterford, he has consistently taken the position both in this litigation and before the PRC that his attempted escape from Graterford should not have been considered as a justification for his continued

administrative segregation while at SCI-Albion or SCI-Forest.  According to Plaintiff, he was facing a capital sentence at the time of his attempted escape and thus, that incident was nothing more than a matter of "survival."  Plaintiff has maintained that, because he now faces only a life sentence, he should no longer be considered an escape threat.  (See, e.g., Defs. Ex. C-2 [79-3] at pp. 34-35, 37, 45.)  He believes that he has paid his dues, that he has sufficiently demonstrated his good behavior while in the RHU, and that he should be given a clean slate and an opportunity to serve the remainder of his life sentence in general population.  However, prison officials at SCI-Albion and SCI-Forest clearly disagree with this view, and this Court is not in a position to second-guess that penological judgment.  *See Stevenson v. Carroll,* 495 F.3d 62, 71 (3d Cir. 2007) ("[W]e are unwilling to substitute our judgment on these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities.") (quoting *Block v. Rutherford,* 468 U.S. 576, 588 (1984)).  Federal case law is clear that prison officials may consider an inmate's past conduct or generally volatile nature in making judgments about whether they pose an ongoing security risk.  *See Shoats v. Horn,* 213 F.3d at 146 (noting that "predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court" and thus, an inmate "could conceivably held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct.").

Equally unavailing is Plaintiff's contention that the notices provided to him concerning his continued placement in AC were constitutionally deficient.  While Plaintiff generally contends that these notices effectively deprived him of a meaningful

opportunity to defend himself against continued administrative segregation, no such finding is reasonably supportable on this record.

For example, Plaintiff makes much of the May 30, 2006 prison record advising him, upon his transfer to SCI-Albion's RHU, that he was being placed into AC Status "pending PRC review of your records for placement into general population." (Defs.' Ex. C-2 [79-3] at p. 33.) Plaintiff apparently considers this notice deficient because it "provide[d] absolutely no security reasons[ ] why [Plaintiff] was placed in [segregation], or even why [Plaintiff] needed to be in [segregation] until records were reviewed…" (Objections [103] at ¶ 24.)[11] Underlying this argument is the implicit, specious assumption that Plaintiff had no fair opportunity to prepare for his PRC meeting or defend against his AC placement because he was clueless as to why he might have been considered a security risk. Yet the record reveals that Plaintiff attended a PRC meeting three days later on June 2, 2006, at which time his administrative custody status was explained to him and he was given an opportunity to present his views, which included the same argument in support of his release to general population as he continues to make now – namely, that he is no longer a security risk and should be returned to general population in light of his improved conduct. (Ex. C-2 at p. 37.) The fact that Plaintiff may have been advised on May 30, 2006 that a thorough review of his records and/or a security review would have to be undertaken prior to consideration of his release from AC did not render his hearing constitutionally deficient or somehow prevent him from a meaningful opportunity to present his point of view about his continued AC status. In fact, following his meeting with the PRC on June 2, 2006,

---

[11] Even if Plaintiff could establish that this notice is somehow deficient, we note that it was issued by Captain O'Neill, who is not a named Defendant in this action.

Plaintiff apparently wrote a letter to the Superintendent in which he further discussed his history on AC status and the reasons in support of his release. (See Defs.' Ex. C-2 [79-3] at p. 34, referencing June 2, 2006 letter to Superintendent Brooks.)

Similarly specious arguments are made by Plaintiff relative to his transfer back to AC status on May 16, 2008. On that date, Plaintiff was returned to administrative custody following his completion of a disciplinary sanction for fighting with another inmate. Plaintiff received notice that he was "being placed in A.C. Status due to being on the Do Not Release List and the completion of a D.C. sanction."[12] (Defs.' Ex. C-3 [79-4] at p. 2.) Plaintiff insists that his due process rights were violated because he did not understand that the "Do Not Release List" was a colloquial reference to the RRL and, therefore, because he did not understand the meaning of this notice, he lacked an adequate opportunity to prepare for and contest his placement into AC. However, the record shows that Plaintiff appeared before the PRC on May 22, 2008, at which time he continued to advocate for a release to general population and attempted to justify his conduct relative to the recent misconduct for fighting, but was advised by the PRC that, due to this misconduct, the Committee would not be submitting a request for his release to general population, as he needed to establish a period of positive adjustment once again. (Id. at p. 6.) Plaintiff appealed this decision to Defendant Sobina, who rejected Plaintiff's contention that no valid security reasons existed to justify his continued confinement in the RHU. (See id. at p. 3 (finding that Plaintiff "poses a threat to the safe, secure and normal operation of this institution" and is "appropriately housed").) Plaintiff raised a further unsuccessful appeal to the Office of the Chief Hearing

---

[12] The only named Defendant having any involvement with this notice is Defendant Balos.

27

Examiner. (Id. at p. 5.) In sum, the record belies Plaintiff's claims that he was denied a fair opportunity to be heard concerning his transfer back to AC status.

I reach the same conclusion concerning Plaintiff's transfer to the RHU at SCI-Forest on July 9, 2009. The final PRC report from SCI-Albion indicates that the transfer to SCI-Forest (a Level 5 institution) had been arranged because the PRC at SCI-Albion (a Level-4 institution) "[did] not feel comfortable recommending his release to general population due to his history of escape." (Id. at p. 14.) The transfer was not supported by any rationale that would reflect negatively on Plaintiff's record, nor did Plaintiff lose any of the privileges he had earned in the RHU at SCI-Albion. (Id. at pp. 14, 21, 27, 34.) Upon Plaintiff's transfer to SCI-Forest, his custody status did not change, and therefore his initial PRC report from SCI-Forest indicates, under "Initial Reason for Confinement," that Plaintiff was placed on AC status at SCI-Albion following the conclusion of his DC sanction for fighting. (Defs.' Ex. C-3 [79-4] at p. 19.) Plaintiff apparently feels this notice was defective in that it did not state any "valid" security reason to justify Plaintiff's continued AC status. Here again, Plaintiff's argument appears to be premised on the specious argument that he was deprived of any real opportunity to contest his continued AC status because he had no notice of the security concerns upon which his administrative confinement was based. However, Plaintiff's records from SCI-Forest, like those from SCI-Albion, contain numerous references to the fact that prison officials continued to view Plaintiff as a security risk based on his past record. (Defs.' Ex. C-3 at pp. 30, 31, 34, 35, 39, 41, 42, 47.)

Plaintiff also argues in his objections that his hearings before the PRC were not sufficiently elaborate and should have included a formal deliberation of the factors laid

out in DC-ADM 802 relative to administrative custody (such as the length of time he had already been in segregation, the number, type, and frequency of his prior misconducts, any perceived risk which he continues to pose to the public or the facility, and the like). (Objections [103] at ¶ 25; Defs.' Ex. A [79-1] at p. 17.) However, for federal due process purposes, "[p]rison officials must provide [inmates] who are transferred into more restrictive housing for administrative purposes only an explanation of the reason for their transfer as well as an opportunity to respond." *Stevenson,* 495 F.3d at 70. No formal hearing is required, and even a written statement by the inmate will suffice. *See Hewitt v. Helms,* 459 U.S. at 476. Moreover, a post-deprivation hearing is constitutionally adequate: "Due to the unique exigencies of prison management, and in accordance with *Hewitt,* the minimal exchange of paperwork… need not occur prior to the transfer of [the inmate]. *Stevenson,* 495 F.3d at 71. *See also Hewitt,* 459 U.S. at 474 and 476 n.8 (Due process "requires only an informal nonadversary review of the evidence," and this "proceeding must occur within a reasonable time following an inmate's transfer…").

Finally, as we have previously discussed, Plaintiff's status on the RRL did not entitle him to a hearing before Beard personally, since the PRC was empowered to make recommendations concerning Plaintiff's placement in administrative custody. Although Plaintiff has alleged that his meetings with the PRC were perfunctory and merely a "sham," I find such a claim unsupportable based on the record as a whole. Plaintiff's remaining objections are similarly without merit. Accordingly, because the evidence before me does not give rise to a genuine issue of material fact relative to

Plaintiff's due process claims at Counts 2, 4, 6 and 7, summary judgment will be entered in favor of the Defendants as to those claims.

B.

Plaintiff's fifth cause of action alleges a violation of his Eighth Amendment rights based on the 24-hour lighting in the RHU. "[T]he Eighth Amendment prohibits punishments which ... involve the unnecessary and wanton infliction of pain ... or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (internal citations and quotations omitted). Included among unnecessary and wanton inflictions of pain are those punishments completely without penological justification. *Id.* "Prison conditions may amount to cruel and unusual punishment if they cause 'unquestioned and serious deprivations of basic human needs … (that) deprive inmates of the minimal civilized measure of life's necessities.'" *Stewart v. Beard,* 417 Fed. Appx. 117, 119 (3d Cir. 2011) (alteration in the original) (quoting *Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410, 417-18 (3d Cir. 2000)).

"At least one circuit has held that, in certain circumstances, constant illumination can rise to the level of an Eighth Amendment violation." *Stewart v. Beard,* 417 Fed. Appx. 117, 119 (3d Cir. 2011) (citing *Keenan v. Hall,* 83 F.3d 1083, 1090-91 (9th Cir. 1996) (inmate was subjected to constant illumination created by large florescent lights positioned directly in front of and behind inmate's cell which prevented him from distinguishing night and day, creating "grave" sleeping and psychological problems)). "However, courts also have concluded that security lights that are similar to night lights and that provide only enough light for officers to conduct nighttime security checks do not impinge on a prisoner's constitutional rights." *Sims v. Piazza*, No. 11-3445, 2012

WL 562254 (3d Cir. Feb. 22, 2012) (citing authority). "Continuous lighting has been held to be permissible and reasonable in the face of legitimate penological justifications, like the need for security and the need to monitor prisoners. *Id.* (citing authority).

In her R&R, the Magistrate Judge noted that the "lights at issue here are the security night lights in the RHU cells which contain 9 watt fluorescent bulbs that remain lit 24 hours a day." (Report and Recommendation [99] at p. 18.) The Magistrate Judge cited evidence from Defendant Beard establishing that "[t]he purpose of providing a low wattage light bulb is so that staff can better monitor inmates who may present a risk of harm to themselves or to others or who may attempt to escape. Individuals in the RHU in general present a greater risk of inappropriate and threatening activity." (Id. at pp. 18-19 (citing Defs.' Ex. B (ECF Doc. No. 79-1 at p. 23, ¶ 4).) Based on her conclusion that the constant illumination of the RHU cells serves the legitimate penological concerns of prison security, the Magistrate Judge opined that Plaintiff had failed to establish an Eighth Amendment violation.

Plaintiff raises numerous objections to this recommendation, none of which we find meritorious in light of the record at hand. Plaintiff insists that certain material facts supportive of his claim are undisputed, such as his averment that he has suffered sleep deprivation and eye problems as a result of the constant illumination and his assertion that Defendant Beard was made aware of these problems but did nothing to remedy the situation. According to Plaintiff, these purportedly undisputed facts preclude summary judgment in favor of Defendant Beard. Plaintiff is mistaken.

Eighth Amendment claims partake of both objective and subjective components. "First, the deprivation alleged must be, objectively, sufficiently serious." *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).  "[S]econd ... a prison official must have a sufficiently culpable state of mind."  *Id.* (internal quotation marks omitted).  The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'"  *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Thus, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Id.*  "Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' … 'only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.'"  Id. (citations and internal quotation marks omitted).

Plaintiff's subjective claims, unsupported by competent medical evidence, that he has suffered serious psychological harm and eye problems because of the lighting in the RHU, fail to satisfy this objective standard.  Numerous courts have found that continuous low-level lighting of the type involved here, when used for security purposes, does not offend 8th Amendment standards.  *See, e.g., Sims v. Beard,* No. 11-3445, 2012 WL 562254 (3d Cir. Feb. 22, 2012) (5-watt light bulb).  *Accord Vasquez v. Frank,* 290 Fed. Appx. 927, 929 (7th Cir. 2008) ("'[E]xtreme deprivations are required to make out a conditions-of-confinement claim,' … and 24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an 'extreme deprivation.'") (alteration in the original) (citation omitted); *Young v. Beard,* Civil Action No. 10-284, 2012 WL 1865596 at *5 (W.D. Pa. May 22, 2012) (no 8th Amendment violation premised on continuous illumination by15-watt security light); *Wills v. Terhune,* 404 F. Supp. 2d 1226, 1230-31 (E.D. Cal. 2005) (exposure to 24 hours 13-watt security bulb); *King v.*

*Frank,* 371 F. Supp. 2d 977, 984-85 (W.D. Wisc. 2005) (constant exposure to 9-watt fluorescent light).[13]

Plaintiff also objects that the regulation at issue is an exaggerated response to security issues because corrections officers do not monitor inmates 24-hours a day and therefore, Plaintiff posits, they could simply make periodic use of the light switches outside the cells or they could use flashlights as needed. In similar fashion, Plaintiff objects that not all inmates in the RHU are a security threat and the regulation consequently penalizes good inmates and bad inmates alike. However, "a prison's internal security is peculiarly a matter [for] the discretion of prison administrators," *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 467 (M.D. Pa., 2010) (*quoting Whitley v. Aiders*, 475 U.S. 312, 321 (1986)), and "[p]rison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (*quoting Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). And, for purposes of determining whether a prison regulation is reasonably related to a legitimate penological interest under *Turner v. Safely,* 482 U.S. 78, 89-91 (1987), prisons are not required to enact the least restrictive alternative. *See Fraise v. Terhune,* 283 F.3d 506, 520 (3d Cir. 2002) (noting that "*Turner* does not impose a least-restrictive-alternative test").

Plaintiff also faults the Magistrate Judge for supposedly relying on unproven facts – i.e., that the bulb in question is a fluorescent 9-watt bulb. Plaintiff maintains that this

---

[13] Plaintiff posits that the wattage is a less important measurement than the lumens, which determines brightness, and he points to evidence establishing that the bulb in question produced 600 lumens. We note, however, that our Circuit Court of Appeals has upheld a verdict for Defendant Beard on an Eighth Amendment claim based on similar conditions-of-confinement in the RHU at SCI-Smithfield. *See Stewart v. Beard,* 417 Fed. Appx. 117, 120 n. 1 (3d Cir. 2011) (noting that lights used in the RHU were low intensity 9-watt, 600 lumen bulbs that gave off less than two foot-candles of illumination).

fact should not be accepted because he was not given the opportunity to inspect the bulb himself, because it is unclear from whence the Defendants got their information, and because the Defendants provided an "evasive and manipulative" answer in discovery. This objection is specious. Information concerning the properties of the RHU security lights comes from Defendants' responses to discovery and from documentation submitted by Plaintiff in support of his own summary judgment papers. (See Pl.'s Ex. 15 [92-1] at p. 58 and Ex. 16 [92-2] at p. 6, ¶ 8.)

Because Plaintiff's objections are not well-founded and because the record does not reasonably support an Eighth Amendment violation based upon the security lighting in the RHU, summary judgment will be entered in favor of Defendant Beard as to Count 5.

## IV.    CONCLUSION

Based upon my de novo review of the summary judgment record, including Plaintiff's objections and various other post-R&R filings, I conclude that summary judgment in favor of the Defendants is warranted as to Plaintiff's due process and Eighth Amendment claims. Plaintiff's partial motion for summary judgment will therefore be denied. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HECTOR HUERTAS,                          )
                                         )
                    Plaintiff,           )        Case No. 1:10-cv-10-SJM-SPB
                                         )
          v.                             )
                                         )
JEFFREY BEARD, et al.,                   )
                                         )
                    Defendants.          )


## ORDER OF JUDGMENT

AND NOW, to wit, this 6th Day of December, 2012, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that Defendants' motion for summary judgment [78] shall be, and hereby is GRANTED and Plaintiff's partial motion for summary judgment [82] shall be, and hereby is, DENIED.

In accordance with the foregoing, JUDGMENT is hereby entered in favor of Defendants and against Plaintiff, Hector Huertas.

The Report and Recommendation of U.S. Magistrate Judge Baxter [99] is adopted as the opinion of this Court to the extent set forth herein.


                              s/    Sean J. McLaughlin
                                    Sean J. McLaughlin
                                    United States District Judge


Cm:    All parties of record.
       U.S. Magistrate Judge Susan Paradise Baxter